Okay, the next case on the docket is 524-0339, Beeple v. Matthew Shaw. Are the parties ready? Yes? Yes. Okay, Mr. Miller, you are for the appellant this time. You may proceed when you are ready, sir. Thank you. May it please the court, counsel, my name is Max Miller and I represent the people of the state of Illinois. Bill is an indictment where we turn to the defendant on the offensive unlawful possession of methamphetamine under five grands and unlawful delivery of methamphetamine. Defendant filed a motion to suppress the evidence, arguing that the evidence obtained from a protective sweep of his residence amounted to a violation of the Fourth Amendment of the United States warrantless search. The trial court agreed to suppress the evidence and declared that any evidence obtained during that search was inadmissible. The state's contention here is that the police officers conducted a valid protective sweep where the defendant had a known criminal history of harboring fugitives and a reputation for renting out rooms to multiple individuals within the same year prior to the defendant's most recent investigation. Now, a single police officer in the midst of securing the scene as the search warrant was obtained spent barely a minute walking through the house, this is on video, and simply looking in doorways to determine whether anyone else was present in the house. The trial court wrongly concluded that the testimony negated any articulable reason, that specific quote, the officers might fear for their safety, and so this court should reverse the judgment of the trial court, granting the defendant's motion to suppress. I'm going to go back to counsel. The trial court relied heavily on the fact, I believe, that Mr. Shaw had not been arrested. Is that correct? Yes, Your Honor. And can you elaborate on the impact of the fact that he was not arrested at the time of the protective sweep? Yes, Your Honor, because this is essentially the defendant's argument, too, that a protective sweep needs to be incident to arrest. But this argument, essentially making that a necessary element, would go in the face of the interpretation of Maryland v. Bowie of the Supreme Court case, because the Supreme Court applied the Terry stop rule to protective sweeps. So they're saying that the risk of the danger of the context of arresting at home is as great on the roadside, or anything like that, for people who could launch an unexpected attack. Now, the Supreme Court defines a protective sweep, quick, limited search of the premises, conduct of the protective safety of the police officers, it limits it. The state's still required to prove the searching officers possess a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual posing as this. So, but really, talk to me just a little bit about that. So, I would agree that the officer, I'm calling him the second officer, the one that did the actual sweep inside the house. He, in fact, did quickly go through each room. But he also was looking everywhere within the house while he was present with Mr. Shaw. You would agree, I mean, he was shining his flashlight and nooks and crannies and things like that, correct? I would not agree that during the conversation with Mr. Shaw that he was conducting an actual search, or at least. So, police arrived there. They already have spoken to an informant, a named informant, and they've got a call in for a warrant. They're waiting on a warrant. So, they go and they approach. I think that's overheard on the microphone during the video. And so, they approach the defendant and say, you know, can we come in? The defendant prevents them entrance into the house. And so, they're talking and then they say, well, can we search the house? He says, no, you can't search the house. And they say, okay, well, we're going to go outside and we're going to wait for the warrant. But I'm going to take a look to make sure that there's nobody else in here. And the question or the issue is, you know, why, if they're talking to him, why all of a sudden do they need to make sure that it's okay? And the specific circumstance of this case are the fact that the police officers know for a fact he's got a history of harboring fugitives. They know this when they're there. They know that other people. But they take him outside, though, don't they? True. They take him outside. They're going to secure the scene. What's the purpose at that point in time to go through and look in the rest of the rooms? To secure the scene, Your Honor, because they're waiting on the warrant. But if somebody is in there, if somebody armed is in there, certainly the officers aren't safe just being out in front of the home. You know, if somebody is in there who's armed, who is lying in wait, certainly they have a right. And, you know, you can see from the video, this minute search, this isn't some pretextual reason to go looking through or rifling through drawers or something like that. It is a minute search where he walks down the hallway. He doesn't go into the room even. He looks through the doors and he says, okay, is anybody in here? Is anybody in here? And, you know, so the question for this court is what is the reason they believe they were in danger? The trial court said they didn't think that there was any articulable reasons. And your first question regarding if you were to say that it has to be instant to arrest, you have elevated this to probable cause. You're saying essentially it has to have probable cause to conduct a protective sweep. And that would go in contradiction to the Supreme Court in Maryland v. Bowie who applies Terry standards to this and says, I mean, the language the trial court even uses, the language of the Terry sweep. It's the specific articulable facts. What are they? That he's got a known history of having fugitives here, that people have stayed here, that we know for a fact within the past year. So while we go outside to wait for the warrant, let's just look and make sure that nobody is in there and not conduct an actual search. But, of course, this was discovered in plain view during that. It's laying on a bed. And the officer saw it. And they call it in. And it makes its way onto the warrant. And so that's what causes the alternate. But if this court were in the record, is there any evidence to support the inference of any officer just because he had a prior history of harboring a fugitive, that that fugitive was there on that date with a gun? And if so, then aren't you, wasn't the officer walking into the very danger he says he was trying to stop? I would say, Your Honor, that it would be the same as, for example, when a terrorist attack was conducted. When you see, if there is any reasonable articulable suspicion. So why might he, in that house that day, suspect that it's going to happen? Because he says, you know, I've been in investigations with this guy before. I know that people stay in this house. I know the fugitive stays in this house. And so what is the question that people versus Davies, the second district, says is really the question here. Were the police lawfully on the premises in the first place? Are they lawfully in the area where they conduct the protective sweep? If they are, the second district says, synthesizing federal case law, that if the police have lawfully entered a residence, they possess the same rights to conduct the protective sweep, whether arrest warrant, search warrant, existence of extreme circumstances, cause of their search. But all of these cases say the police must not have entered or remained in the home illegally. So the states of contention is, police here, we're legally in the house. Now, in people versus Davies, the second district end up saying, no, we're suppressing this evidence. You can't say that it comes in plain view after an illegal entry. The difference in this case, we have a legal entry. They're in there legally. They do withdraw in order to wait for the search warrant, but they're just making sure there's no one in there because they happen to know that this defendant has had people stay there in the past, and a fugitive is absolutely an articulable reason that there could be a danger there. And they're just making sure that no one's in there. It's no different than, you know, packing somebody down, you know, making sure that there's nothing that's going to endanger the police officers as they wait for that warrant. But the entire investigation in this case was not related to his status as somebody who harbors a fugitive. No. They thought he had drugs. Sure. Absolutely, Your Honor. And so in a particular suite. It's a bit pretextual for them to say, well, we knew he had harbored fugitives in the past. Well, so the testimony at the suppression hearing was to give the trial court an articulable reason why they might fear for their safety. And the police officers say, look, we've dealt with this guy in the past. We know that he has harbored fugitives. He's harbored people in the home. All we did was we looked through the home. It's on camera. Look, you can tell we're not looking for anything in particular. We're making sure that nobody else is in here. They're calling out anybody in here because we know the defendant has a history of that. And I'm going to interrupt you. I'm not sure that they weren't looking for anything in particular. But I would like for you to address the trial court had a significant issue with the affidavit and the search warrant. Let's assume for a moment, and I'm not suggesting that we would find this, but let's assume for a moment we find that the protective suite was not valid. Does that search warrant stand on its own? It's the state position that it does. So in the answer brief of the defendant file, they rely on this court's decision in People v. Carter where they talk about the independent source rule. And, of course, there's two steps to that. The illegality did not influence the officer in seeking the warrant. The defendant concedes that's not the case here. They were already searching for other – trying to achieve the search warrant before. The second one, the information gleaned from the illegal entry did not inform the judge's decision to issue the warrant. And so they say, you know, how could the state possibly assert that this methamphetamine didn't influence the decision? But what exactly does that second step mean? I mean, the second district in People v. Fieldowski, excuse me, considered this second problem and says that this can't contradict the Supreme Court in Murray, which says the state can't be placed in a worse position than it would have been in had there been no, you know – No, no, no. A worse position here. No, no, no. But if you redacted the possession of the methamphetamine, certainly you had a closer case on the probable cause for the warrant. And so the state's simply saying, redact that, the methamphetamine from the warrant, and then look at the warrant on its face. What do we have in order to find probable cause? Well, we have that Dutton tells Fritcher that he's been driving around the defendant in the defendant's vehicle, that the defendant gave him methamphetamine, that he'd been doing work at the defendant's house for him, and the defendant paid him the methamphetamine. Isn't there a requirement that you have to show this individual is somewhat reliable? I mean, this is not a confidential source. This is just somebody that they pulled off the street, basically. Yes, Your Honor. To that, I would just say that simply that investigator Fritcher spoke to the defendant, that he had his name, that he secured the information, and that he searched and they found a possible nexus. But the state admits that this is obviously a much closer case without. But if this court finds it was a valid protective sweep, the methamphetamine being done is on there, and so it's. But if, as Justice Strohler suggests, you put that aside, the protective sweep, it seems that just having Danny advise lacks some substantiation for this warrant to stand on its own. I understand, Your Honor. I understand your position. Would you agree with that? I was going to follow up on that. Go ahead. Please do that. Well, no. I would simply say that investigator Fritcher thought that that was sufficient for conducting the warrant, so that we think that the case is there a sufficient nexus based on inference between this time. There was that sufficient belief that there was a good faith argument to be made that it was. Okay. But thank you, Your Honors. Just a moment. I apologize for taking my time. Thank you. You will have three minutes after the argument by the appellee. Appellee, I'm going to ask you to start with the affidavit and the search warrant. I'm sorry. If you'd just state your name first, that would be great. We'll let Justice Strohler jump in. Good morning. May it please the Court, I am Fred Hanson. I'm representing the appellee, Mr. Shaw, in this matter. I'm eager to hear from you. I believe before I began, Your Honor, I believe you want me to start with the affidavit rather than. . . The search warrant, the affidavit. I'd appreciate it if you start there because it's fresh in my mind. I think there's two issues here. Do you want to discuss the independent source doctrine or the application of Gates? Either or. I'll let you start. Let's start with Gates. We'll resume with Gates. Gates specifies that when reviewing probable cause determinations, the reviewing court should use a totality of the circumstances, and Gates embodies that. What Gates does not stand for is the proposition that it's just the totality of the circumstances. Gates Court goes on to incorporate previous Supreme Court decisions that say, yes, if there is a non-affidavit statement, Gates are concerned in an anonymous letter, but the analysis holds just the same. When the information comes from an informer or a non-affidavit, information in the affidavit, statements made by a non-affidavit. In this case, the informer, Danny Dutton, is the non-affidavit. Those statements have to be corroborated somehow, or at the very least, that the veracity and basis of knowledge of the non-affidavit, in this case Danny Dutton, need to be verified or vouched for. Often this is accomplished through the non-affidavit appearing in court and testifying. The record reflects the common practice of the court below when issuing search warrants. They comment on this. Or the police, in this case, or the individual submitting the affidavit, may vouch for that person and say, in the past, we've received information from this person that has been found to be reliable, and we've based these convictions or have obtained valid search warrants as a result of this information. Here, there's none of that. Absolutely none. What we have, what we can corroborate, is that Danny Dutton had methamphetamine. That's the only thing. Everything else is a statement aside from the information from the search, the illegal search. But everything else is a statement from Danny Dutton. We don't know what his relationship is with Mr. Shaw. We don't know when he was driving around in the car. We don't know where he allegedly received this methamphetamine from Mr. Shaw. But it does mention his residence, correct? I mean, it does indicate the residence. Danny Dutton's statement with respect to Mr. Shaw's residence is that Danny Dutton was doing some work for Mr. Shaw, and that, as a result of that, Mr. Shaw gave him methamphetamine. A glass methamphetamine pipe that was broken at his residence. Okay, on the first part, Mr. Dutton does not say where he received that methamphetamine, or even that it was inside Mr. Shaw's house. With respect to the glass pipe that was broken, the statement there is Mr. Dutton heard Mr. Shaw allegedly complain or was mad about a broken meth pipe in his home. Mr. Dutton did not see that. He did not say where he was when he learned that Mr. Shaw was angry. He didn't even say that he learned that Mr. Shaw was angry by direct contact. He may have heard that from somebody else. The affidavit is unclear. So, under gates, the information in the warrant that's provided by Danny Dutton absolutely fails. It's not corroborated. There is no testimony regarding Danny Dutton's veracity. The basis of knowledge, which is a component of that analysis, Certainly, he says, I was in Mr. Shaw's truck. And they didn't search that initially. Not in his home. There's nothing that says Danny Dutton was in the home. But the basis of knowledge in there, there's some. But, again, that's only if you assume the veracity of Danny Dutton, which this court cannot, based on the facts of the record. Or at least shouldn't. Thank you. Does that answer it? Yes, it does. Thank you. There were two entries to the house. Not one. Two. Sheriff Stevens and Deputy Cook approached the door. This is visible on the body camera. They knock on the door. They ask to enter the home. Mr. Shaw allows them into the home. They engage in a conversation. In my five years as an appellate defender, I have not seen body camera footage between a defendant and law enforcement that has been more cordial. This is a very cordial interaction. The police say they suspect him of having meth. And they say they are getting a search warrant. They ask for consent to search the house. Mr. Shaw clearly declines their invitation to search his home. They say they're securing a search warrant. The officers then say, well, we want to bring it out of the house so we can get a search warrant. Is there anybody else inside the home? They ask that several times. He denies it each and every time. Mr. Shaw's vehicle was the only one outside. There was no evidence of anyone else in the home that was apparent. They ask Mr. Shaw to come outside with them. Mr. Shaw says, wait, I've got my Brussels sprouts in the kitchen. Can I get those? Sure. So apparently he's on a first-name basis with the sheriff. They go back there. He gets his Brussels sprouts. They go out the front door. Deputy Cook, Sheriff Stevens, Mr. Shaw exit the front door and pause. It's at this point Sheriff Stevens says, hey, Deputy Cook, we're going to do a protective sweep, secure the site. And Deputy Cook, alone, re-enters the house and conducts a sweep. Now, we're not arguing that this sweep wasn't brief and quick. It only took approximately a minute. But that's not what Bowie requires. Bowie requires an arrest in the home and a protective sweep that is done for the protection of the officers and others. If you watch the video, the body cam, the defensive posture of Sheriff Stevens as he is waiting after sending in Deputy Cook alone, he doesn't seem too concerned about anything. With respect to the issue of Mr. Shaw's alleged harboring a fugitive, no, he was never charged with harboring a fugitive. They never said they found anybody. They said he was arrested for that. They didn't say where they found the fugitive. So that's quite attenuating. Yes, there was a person that was living at the residence at the time that they were aware of. Mr. Shaw denied that person. I see I'm almost out of time here, so I move on quickly to the analysis under the… I'm interested in your argument about the second entry, that you have divided this into two entries. Because in the second entry, the police would certainly have known that they didn't have permission to search the residence because they asked that during what you characterized as the first entry. The police never received consent. They asked, and Mr. Shaw affirmatively declined. But then they re-entered the house as you divide this up. After everyone exited, they re-entered the house. This would be similar to a guest being invited to your home, not an all-too-familiar guest, like your mother-in-law. And they go outside, and you close the door. Did they close the door? You won't expect a guest to re-enter the house. But did they close the door? Was the door actually closed? I don't recall if the door was actually closed. I believe it was, but I cannot say definitively, Your Honor. But they were past the threshold. They were past the threshold. Yes, Your Honor. They were closed, but then they decided to do the protective sweep. But this was not used by the trial court as a basis for its order the way you've described it. The trial court did specifically—I see my time is up, Your Honor. Go ahead. Please answer. The trial court did specifically address why Deputy Cook re-entered the home after everyone was outside. And the response, I believe, was after Stevens was doing a protective sweep. Right. It was in the context of a protective sweep. So my curiosity is, if you have a re-entry as you've described it, can that be a valid basis for a protective sweep? Once you've exited, you know you don't have consent to go again. But can you have a protective sweep anyway? There are a number of cases, Your Honor, that talk about multiple entries and whether those multiple entries—or where there is a valid entry, and then—in fact, I apologize. I don't have the case name off the top of my head. But where there is an initial entry into a home to look for a person, and the police go in. They look in spaces that would contain a person, and they find contraband. In this case, it was, I think, marijuana seeds. They secure the person. They bring that person out. And then they go back and start searching more and call it a protective sweep. But they're looking in places behind the bed, between the wall and the bed, where they find more contraband. And in that case, the court parsed it out. The contraband seen in plain view during that initial valid entry to apprehend an individual, where they looked in places that an individual could be hiding, that was valid. The subsequent searches that were done after that were not valid. And the evidence in those cases was correct. Even though the allegation was that it was a protective sweep? They can assert that it was a protective sweep. But again, the protective sweep is only a cursory look in places that people might be. Wedge between the bed and the wall or behind a headboard. Those are not places where a person could hide. Under the bed, yes. In fact, that's where they found, in that particular case, cannabis seeds. I have a follow-up question. The court order specifically says I have it here. All witnesses testified that they had no reason to believe that anyone else was present in the defendant's residence. Doesn't that essentially eliminate the need for a protective sweep, if the trial court is correct there? The court did make that conclusion. If you look at the actual testimony, certainly Deputy Cook testified that he had no reason to believe either way whether there was a person in the house. So Deputy Cook's testimony, he makes a very emphatic statement there. I don't know. But there's two officers there, Deputy Cook and Sheriff Stevens. Sheriff Stevens elaborates on the prior search warrant that was done pursuant to an allegation of harboring a fugitive. Sheriff Stevens makes some allegations that, well, we know he has rented out rooms in the past or that there's an individual that is currently running out of place. Now, recall that the mere capacity of a building to hold people is an inadequate basis for a protective sweep. But the court does reach that conclusion after, we presume, reviewing all of the testimony there. It does reach the conclusion that probably a better way the court could have phrased that is they did not articulate facts sufficient to justify a protective sweep as required under Bowie. Thank you. Okay. Thank you very much for your arguments. Thank you. Mr. Miller? Just briefly, Your Honor. Just to get to Justice Sholar's question in the first one again. So if what the court is saying is that the information provided in Fritcher by Dutton, if that requires independent substantiation, it's not the State's position that that exists. The State was not saying that. If that is the case, then the State would be forced to admit that there was not sufficient out there. What the State suggested in its brief is that the case that was cited, and I believe it was Gates, that that was dealing with an anonymous letter, an unnamed person. The State was believing that with the information provided here, that this was a sufficient basis. But moving on to the protected, but clearly the primary thrust of the State's argument in the case falls on this protective sweep. Was it a valid protective sweep or was it not? And this idea, I believe the defendant was talking about another case at the time, but again, in the circumstances here, the police were not going through and looking through every nook and cranny or looking at places that people could not be hiding. The police looked in the house in order to determine if anyone was in there. This idea of parsing it out into two entries, a first entry and a re-entry, the State would simply say, when they arrived, again, this is cordial, the defendant welcomed them in his home, everything like that. They say, we're going to conduct a protective sweep. This is still part. He hasn't said, okay. He said, I don't want you to search. But he didn't say, get off my property. I don't want you here anymore. You're not allowed to be here. Now, he moves into being detained after that point when they're outside. I mean, certainly that's the case. But he was asked for his consent to search when they first came in. He was. And they said no. And so they're not going to search. And the State's contention here is that when they did that protective sweep, that was not a pretextual reason to go looking for drugs. That's not what was happening. The State believes that the evidence shows that in the video, and this court can make that determination. But even though the court said, you know, we have the testimony of Cook and Steele, they said, we saw nothing that would necessarily indicate that someone was in there. But the trial court had a hearing on this. And, of course, they said, well, this is what I know about the defendant. When a police officer goes to a scene, they take with them the information they have, and they have a right to ensure their safety. And, you know, they're not waiting outside for a warrant. In a sense, they're vulnerable if somebody were in the house. So all they did was they went inside. But how do you respond to Justice Schor's comments that the trial court did make a finding that, I put it down, there was no reason to believe there was anyone else in the house? How do you get around that? Well, the State believes that that finding is in direct contradiction with the testimony of Stevens. That if Stevens says, well, I have a history. I know this guy. He's Harvard fugitive. There was somebody living with him less than a few months ago. That's a direct contradiction. That finding would be manifestly erroneous. Well, but can't the trial court make a credibility determination to determine whether or not that testimony was credible? I believe so, Your Honor. But I don't believe that in the findings of the trial court, you'll find him say that he did not believe the police officer's testimony regarding the history of the defendant or his concerns with the pick and search were incredible or anything like that. No, and I agree with you there. But for whatever reason, the court did make the other finding that nobody, there was no reason to believe that there was anyone else in the house. That's how I wrote that. I agree, Your Honor. And of course, the State believes that that finding is in direct contradiction with the testimony. And that's the manifest error by which the State would ask that you would reverse the defendant's motion. Unless there are any other questions. Thank you, Your Honor. All right. Thank you, Mr. Miller. And thank you, Mr. Hanson, for your arguments here today. The matter may be taken under advisement. We'll issue an order in due course.